Harold SCOTT, Plaintiff,

v.

Thomas A. COUGHLIN, III, Commissioner, Department of Correctional Services; Charles J. Scully, Superintendent, Green Haven Correctional Facility; R. Seitz, Deputy Superintendent; C.R. Winch, First Deputy Superintendent; J. Tanner, Correctional Captain; S. Albury, Correctional Sergeant; J.A. Wilcox, Correctional Officer; Gordon LaBonte, Correctional Officer; K. Erickson, Correctional Officer; J.R. Novak, Correctional Officer; N.K. Howe, N.Y.S. Police Investigator; and Donald Selsky, Director, Department of Correctional Services Special Housing/Inmate Disciplinary Program, Defendants.

No. 90 Civ. 494 (RJW).

United States District Court,
S.D. New York.

Oct. 23, 1996.

Michael W. Martin, New York City, for Plaintiff.

Attorney General of the State of New York, New York City (Dennis C. Vacco, Attorney General, Vincent Leong, of counsel), for Defendants.

## OPINION

ROBERT J. WARD, District Judge.

Defendants Thomas A. Coughlin, III, Charles J. Scully, Robert Seitz, Charles R. Winch, Joseph Tanner, Stephen Albury, Gordon LaBonte, John R. Novak and Nelson K. Howe ("defendants") have moved for an order pursuant to Rule 56(b), Fed.R.Civ.P., granting summary judgment on the grounds that there are no material facts in dispute and that defendants are entitled to judgment as a matter of law. Additionally, defendants have moved, pursuant to Rule 15(a), Fed. R.Civ.P., for an order granting leave to amend their answer to include the defense of collateral estoppel. Plaintiff Harold Scott ("Scott") has filed a cross-motion pursuant to Rule 56(a), Fed.R.Civ.P., for an order granting partial summary judgment. Scott has also moved for an order pursuant to Rule 15,

Fed.R.Civ.P., granting leave to amend his complaint to add the Director of the New York State Department of Correctional Services ("DOCS") Special Housing/Inmate Disciplinary Program, Donald Selsky ("Selsky"), as a defendant. For the reasons hereinafter stated, plaintiff's motion to amend is granted, defendants' motion for summary judgment is granted, defendants' motion to amend is denied, and plaintiff's motion for summary judgment is denied.

## BACKGROUND

Scott is an inmate presently incarcerated at Green Haven Correctional Facility ("Green Haven"). On or about November 7, 1986, Correction Officer John R. Novak ("Novak") searched Scott's cell during a block-wide frisk and allegedly found a six-inch sharpened shank, or homemade knife, in one of the legs of Scott's bed. As a result, Scott was served with a misbehavior report signed by Novak charging him with possession of a weapon in violation of DOCS Inmate Rule 113.10, which prohibits inmates from making, possessing, selling, or exchanging any item of contraband that may be classified as a weapon by description, use, or appearance.

On or about November 13, 1986, Deputy Superintendent Patrick McGann ("McGann") conducted a Tier III disciplinary hearing ("the McGann hearing") regarding the shank charges against Scott. At the hearing, Scott pleaded not guilty to the shank charges, and requested the production of the shank, which he alleges never to have seen, and the cell-search logbook. McGann declined to rule on Scott's requests, but instead found Scott guilty of the weapon possession charge and sentenced him to 45 days in keeplock confinement.

Scott appealed McGann's ruling to Thomas A. Coughlin, III ("Coughlin"), the Commissioner of DOCS. Selsky, who reviewed inmate disciplinary appeals to the Commissioner's office, affirmed McGann's disposition. Scott thereafter filed an uncontested Article 78 petition in New York State Supreme Court. The court granted Scott's petition and directed defendants to expunge the incident from Scott's record. *See In the Matter of the Application of Harold Scott,* No. 87–3428, Decision and Order, at 1–2 (N.Y.Sup. Ct. Jan. 29, 1988).

Following the McGann hearing, Nelson K. Howe ("Howe"), a New York State police investigator who had questioned Novak about his alleged discovery of the shank, signed felony complaints charging Scott with criminal possession of a weapon in the third degree. On or about January 22, 1987, Scott was summoned to Beekman Town Justice Court ("Beekman Court") on the felony charges. According to Scott, he did not know until that day that he was to be arraigned on criminal charges. Scott resisted attempts by correction officers to produce him before the court without a written court order, allegedly because he believed that, without such an order, he was not obligated to enter the courtroom. Ultimately, correction officers handcuffed Scott and brought him into the courtroom. As a result of his refusal to enter the courtroom without restraints, Scott was served with a misbehavior report signed by Correction Officer Gordon LaBonte ("LaBonte") charging him with refusing a direct order, interference, and verbal harassment.

On or about January 28, 1987, Correctional Captain Joseph Tanner ("Tanner") conducted a Tier III disciplinary hearing ("the Tanner hearing") regarding the misbehavior report. LaBonte testified that he had witnessed Scott violate Sergeant Stephen Albury's ("Albury") direct order that he enter the courtroom. Tanner then adjourned the hearing in order to obtain testimony from Albury. Before the hearing was adjourned, Scott requested that Tanner obtain testimony from both the lawyer who represented him at the Beekman Court proceeding and the judge before whom the Beekman Court proceeding took place. Tanner denied Scott's request when the hearing resumed on February 2, 1987, stating that, because neither the lawyer nor the judge had "witnesse[d] the misbehavior nor had knowledge of state rules," their testimony was irrelevant. Tanner Hearing Record, at 11.

At the adjourned hearing, Albury testified that he offered Scott the choice of entering the courtroom with or without restraints, and

that Scott chose to enter with restraints; that he did not see the judge outside the courtroom during this discussion with Scott; and that it was Sergeant Dunlavey ("Dunlavey") who ultimately brought Scott into the courtroom. Scott thereupon requested that Tanner call Dunlavey to testify. Tanner denied this request. At the conclusion of the hearing, Tanner found Scott guilty of refusing a direct order and interference, and sentenced him to 60 days in keeplock confinement. Rather than being confined in his own cell, Scott was taken to the A2 Special Housing Unit ("A2–SHU") on February 4, 1987, where he was confined until on or about March 22, 1987.

Scott appealed Tanner's ruling to Coughlin. Selsky, on behalf of Coughlin, denied Scott's appeal. Thereafter, Scott filed an Article 78 petition in New York State Supreme Court. The court dismissed the petition for failure to state a claim, finding that Scott was not entitled to disobey a direct order by a correction officer whether or not that order was proper. Consequently, the court declined to review Scott's procedural due process claims, finding that such claims were academic. *See In the Matter of the Application of Harold Scott*, No. 87–3428, Decision and Order, at 1–2 (N.Y.Sup.Ct. Mar. 1, 1988).

On or about February 22 and 23, 1988, Scott was tried before a jury in the Beekman Court on the criminal charges arising from the shank incident. The trial ended in a mistrial, and the charges were dismissed.

On January 22, 1990, Scott filed the present action *pro se* under 42 U.S.C. §§ 1983 and 1985, charging defendants with violating his rights under the Fourteenth Amendment. On July 25, 1990, this Court granted defendants' motion to dismiss as to plaintiff's five claims concerning defendants' failure to secure a court order prior to producing him in court. Then, on March 19, 1991, this Court granted defendants' first summary judgment motion as to those portions of plaintiff's claims concerning the denial of Scott's requests to present evidence at the Tanner hearing. The remaining claims in this action allege: (1) that Tanner infringed upon Scott's due process rights by failing to provide a fair and impartial hearing, denying his right to call witnesses, and failing to provide witness denial forms; (2) that Coughlin and Superintendent Charles J. Scully ("Scully") have supervisory liability for the infringement of Scott's rights by Tanner; (3) that Tanner, Scully, Coughlin, Deputy Superintendent Robert Seitz ("Seitz"), First Deputy Superintendent Charles R. Winch ("Winch"), Albury, and LaBonte harassed Scott in retaliation for the assertion of his due process rights; and (4) that Scully has supervisory liability for McGann's denial of Scott's right to present documentary evidence.

Defendants now request summary judgment in their favor on all of the remaining claims. In addition, defendants seek to amend their answer to include collateral estoppel as a defense to the claims regarding due process violations alleged to have taken place at the Tanner hearing. Scott requests summary judgment in his favor on the claims alleging that Tanner infringed upon his due process rights. Finally, Scott wishes to amend his complaint to add Selsky as a defendant for his role in failing to remedy the alleged due process violations at both the Tanner and McGann hearings.

## DISCUSSION

First, this Court will address Scott's motion to amend his complaint to add Selsky as a defendant. This Court then will consider defendants' motion for summary judgment. Finally, this Court will discuss all other pending motions.

### I. Amendment of the Complaint

█ Scott seeks to amend his complaint to add Selsky as a defendant on the claims asserting supervisory liability for the alleged violations of his due process rights at the Tanner and McGann hearings. The decision of whether to allow Scott to amend his complaint is within this Court's discretion. *See Townes v. New York City*, No. 94 Civ. 2595, 1996 WL 164961, at *2 (E.D.N.Y. Mar. 28, 1996). Under the Federal Rules of Civil Procedure, leave to amend a complaint is to be "freely given when justice so requires." Rule 15(a), Fed.R.Civ.P.

Because the three-year statute of limitations applicable to Scott's civil rights action has expired, however, Scott can amend his complaint to add Selsky only if such an amendment "relates back" to the original date of the complaint. Rule 15(c), Fed.R.Civ. P., provides that an amendment adding a defendant to a complaint relates back to the original pleading if the claims against the new party arise out of the same conduct or occurrence as those in the original pleading, and, within 120 days of filing the original complaint, the new defendant (1) has received such notice of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party,[1] the action would have been brought against him.[2] *See Soto v. Brooklyn Correctional Facility*, 80 F.3d 34, 35 (2d Cir.1996).

There is no dispute that the claims which Scott wishes to assert against Selsky arise out of the events set forth in the original pleading. Defendants contend, however, that because Selsky was not informed of the original action until August 1, 1990, almost eight months after the complaint was filed, Selsky did not receive notice of the original action as required by Rule 15(c). In addition, defendants argue that there is no evidence that Selsky knew or should have known that Scott would have brought this action against him. Scott argues that both the notice and the knowledge requirements of Rule 15(c) are satisfied because Selsky had constructive notice of the original claims.

■■■ Under the constructive notice doctrine, "the court can impute knowledge of a lawsuit to a new defendant government official through his attorney, when the attorney also represented the officials originally sued, so long as there is 'some showing that the attorney[s] knew that the additional defendants would be added to the existing suit.' " *Velez v. Koehler*, 87 Civ. 2019, 1991 WL 130913, at *2 (S.D.N.Y. July 8, 1991) (quoting *Gleason v. McBride*, 869 F.2d 688, 693 (2d Cir.1989)); *see also Hood v. City of New York*, 739 F.Supp. 196, 199 (S.D.N.Y.1990); *Hodge v. Ruperto*, 739 F.Supp. 873, 881 (S.D.N.Y.1990).

As a DOCS official, Selsky is entitled to representation by the Attorney General, who represents all of the defendants in this case. In addition, the Attorney General should have known that Selsky would be added to the lawsuit. In his original complaint, which was filed *pro se*, Scott named Coughlin as a defendant, claiming that he had supervisory liability for the alleged infringement of Scott's due process rights by DOCS employees. As defendants point out in their brief, it was Selsky who reviewed and denied Scott's appeals regarding the alleged due process violations. Given these factors, the Attorney General should have known that but for Scott's lack of sophistication with both the law and the delegation of responsibility within the Commissioner's office, Scott would have added Selsky as a defendant to his complaint.

Moreover, neither the State nor Selsky will suffer any prejudice as a result of the addition of Selsky as a defendant. The Attorney General has appeared and vigorously litigated this dispute on behalf of each of the originally named defendants since March of 1990. *See Velez*, 1991 WL 130913, at *3. From that time, the Attorney General was on notice to prepare a defense for foreseeable defendants, and thus has had every incentive

---

**1.** Although Rule 15(c) states that it applies in cases of mistaken identity, the courts of this Circuit have not limited its application to cases of mistaken identity or misnomer. *See Varrone v. Bilotti*, 867 F.Supp. 1145, 1154 n. 7 (E.D.N.Y. 1994); *Hood v. City of New York*, 739 F.Supp. 196, 198 n. 1 (S.D.N.Y.1990).

**2.** Rule 15(c), Fed.R.Civ.P., was amended effective December 1, 1991—after Scott filed his original complaint, but before Scott filed his motion to amend the complaint. Under the old version, the two requirements of the rule had to be ful-

filled within the established limitations period, while the revised version allows fulfillment of those requirements within 120 days of filing the original complaint. Because the amended version of the rule applies to cases pending in the district courts on December 1, 1991, "insofar as just and practicable," this Court finds that the amended version of Rule 15(c) applies to Scott's motion to amend his complaint. *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 468 (2d Cir. 1995) (quoting Order of Apr. 30, 1991, Adopting Amendments to Fed.R.Civ.P).

to preserve evidence, interview witnesses, and "otherwise defend the case with vigor." *Id.* Finally, because the facts giving rise to the claims Scott wishes to assert against Selsky are identical to those asserted in the original complaint, Selsky will not be prejudiced in his defense against those claims. *See Varrone v. Bilotti,* 867 F.Supp. 1145, 1155 (E.D.N.Y.1994); *Velez,* 1991 WL 130913, at *3.

Because the requirements for constructive notice have been satisfied, this Court agrees with Scott that Selsky had adequate notice of this action, and should have known that, but for Scott's mistake, he would have been named as a defendant in the original complaint. Accordingly, the amendment of Scott's complaint properly relates back to the original complaint under Rule 15(c), and Scott is entitled to amend his complaint to add Selsky as a defendant.

## II. *Defendants' Motion for Summary Judgment*

Defendants base their motion for summary judgment on numerous grounds. Because the Supreme Court's decision in *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), is dispositive here, this Court will address only defendants' argument that because Scott has failed under *Sandin* to allege a liberty interest protected by the Fourteenth Amendment, Scott's claims must be dismissed as a matter of law.

### A. *The Standard*

Summary judgment is appropriate where the moving party has established that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. On a motion for summary judgment, the Court "must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in its favor." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993). Initially, the moving party must show that there is "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, the opposing party must set forth "specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed. R.Civ.P.

The party opposing summary judgment must introduce evidence beyond the mere pleadings to show that there is an issue of material fact concerning "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. In determining whether the non-moving party has satisfied its burden, " '[i]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs,' and a dispute over irrelevant or unnecessary facts will not preclude summary judgment." *Hayes v. Coughlin,* Nos. 87 Civ. 7401, 89 Civ. 5498, 1996 WL 312382, at *2 (S.D.N.Y. June 10, 1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

### B. *The Motion*

■ Defendants argue that Scott's §§ 1983 and 1985 claims fail as a matter of law. Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under § 1983, "a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Eagleston v. Guido,* 41 F.3d 865, 876 (2d Cir.1994) (quoting *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)), *cert. denied,* —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995). To state a claim under § 1985, "a plaintiff must prove that defendants (1) engaged in a conspiracy; (2) for the purpose of depriving ... any person ... of the equal protection of the laws ...; (3) acted in furtherance of the conspiracy; and (4) deprived such person ... of the exercise of any right or privilege of a citizen of the United States." *Scott v. Coughlin,* No. 90 Civ. 494, 1990 WL 108383, at *3 (S.D.N.Y. July 26, 1990). Scott

relies on §§ 1983 and 1985 to pursue his claims that defendants, either directly or in their supervisory capacity, violated his Fourteenth Amendment due process rights in the conduct of both the Tanner and McGann hearings, and in the alleged retaliatory actions taken in response to the assertion of Scott's constitutional rights.

### i. The Standard

In order to evaluate Scott's claims, this Court first must decide whether he has alleged "a liberty interest significant enough to trigger the protection afforded under the Due Process Clause." *Webb v. Artuz*, No. 93 Civ. 5985, 1996 WL 452260, at *3 (S.D.N.Y. Aug. 8, 1996). Only if Scott has alleged a liberty interest protected by due process must this Court "determine if the defendants provided the procedural protection required by *Wolff v. McDonnell* and its progeny." *Id.* at *3 (citing *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).[3]

█ Protected liberty interests may arise "from either the Due Process Clause itself or from the laws of the states." *Rivera v. Coughlin*, No. 92 Civ. 3404, 1996 WL 22342, at *4 (S.D.N.Y. Jan. 22, 1996). The Due Process Clause itself confers a protected liberty interest only when a prisoner is subjected to confinement which is " 'qualitatively different' from the punishment characteristically suffered by a person convicted of a crime and results in 'stigmatizing consequences.' " *Sandin v. Conner*, — U.S. —, — n. 4, 115 S.Ct. 2293, 2297 n. 4, 132 L.Ed.2d 418 (1995) (quoting *Vitek v. Jones*, 445 U.S. 480, 493–94, 100 S.Ct. 1254, 1263–64, 63 L.Ed.2d 552 (1989) (involuntary transfer to a mental hospital)); *see also Washington v. Harper*, 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990) (involuntary administration of psychotropic drugs).

Prior to the Supreme Court's decision in *Sandin v. Conner*, — U.S. —, 115 S.Ct.

2293, 132 L.Ed.2d 418 (1995), a liberty interest arose from state law where state prison regulations used "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that administrative segregation will not occur absent specified substantive predicates." *Hewitt v. Helms*, 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983). Applying the methodology developed in *Hewitt*, courts "essentially scoured state prison regulations to determine if the language of such was of an unmistakabl[y] mandatory character, thereby creating a protected liberty interest." *Brown v. McClellan*, No. 93 Civ. 0901, 1996 WL 328209, at *3 (W.D.N.Y. June 11, 1996). The *Sandin* Court found that this practice caused courts to focus improperly on the language of a particular regulation instead of on the nature of the liberty interest at issue, created a reluctance on the part of the state to codify prison management procedures so as to avoid the creation of new liberty interests, and involved federal courts too intimately in the day to day management of prisons. *See Sandin*, — U.S. at — – —, 115 S.Ct. at 2298–99.

█ In response to the problems created by the *Hewitt* approach, the *Sandin* Court altered the due process analysis of claims arising from alleged violations of state prison regulations. Under *Sandin*, a prisoner has a state-created liberty interest that triggers due process protection only when a "regulation narrowly restricts the power of prison officials to impose the deprivation and the interest in question is one of 'real substance.' " *Webb*, 1996 WL 452260, at *3 (quoting *Sandin*, — U.S. at — – —, 115 S.Ct. at 2297–98). An interest of "real substance" is limited to "freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the

---

**3.** In *Wolff*, the Supreme Court required the government to afford the following due process protections to a prisoner facing a disciplinary hearing: (1) written notice of the charges must be given to the disciplinary-action inmate no less than 24 hours before the inmate's appearance at the hearing so that the inmate may be informed of the charges and prepare a defense; (2) there must be a "written statement by the factfinders as to the evidence relied on and reasons" for the disciplinary action; and (3) the inmate should be allowed to call witnesses and present documentary evidence in his or her defense if permitting him or her to do so would not be unduly hazardous to institutional safety or correctional goals. *Wolff*, 418 U.S. at 564–66, 94 S.Ct. at 2978–80.

ordinary incidents of prison life." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2300.

■ Scott clearly cannot allege a liberty interest arising directly under the Due Process Clause. *See Webb,* 1996 WL 452260, at *4; *Rivera,* 1996 WL 22342, at *4; *Rosario v. Selsky,* 94 Civ. 6872, 1995 WL 764178, at *3 (S.D.N.Y. Dec. 28, 1995). Thus, in order for this Court to reach the question of whether Scott's due process rights were violated, Scott first must demonstrate that he was subject to confinement that created an "atypical and significant hardship" under *Sandin,* and that New York regulations grant inmates a protected liberty interest in remaining free from that confinement. *See Santana v. Keane,* No. 90 Civ. 6309, 1996 WL 465751, at *3 (S.D.N.Y. Aug. 14, 1996).

In *Sandin,* the Court held that inmate DeMont Conner's ("Conner") 30–day confinement in disciplinary segregation in a Hawaii maximum-security prison "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301. In making this determination, the Court looked to the fact that the duration of Conner's sentence was not affected by his disciplinary confinement. *Id.* at ——, 115 S.Ct. at 2302. The Court also considered that Conner's "disciplinary segregation . . . mirrored those conditions imposed upon inmates in administrative segregation and protective custody," and "did not exceed similar, but totally discretionary confinement in either duration or degree of restriction." *Id.* at ——, 115 S.Ct. at 2301. For these reasons, the Court concluded that Conner's confinement did not cause "a major disruption in his environment." *Id.*

Scott asks this Court to find that *Sandin* is not controlling here because New York inmates possess a liberty interest in being free from unlimited disciplinary confinement and because, unlike the prisoner in *Sandin,* Scott faced the risk of a potentially unlimited sentence of disciplinary segregation. Citing several pre-*Sandin* Second Circuit cases, Scott contends that New York inmates who face the highest level of disciplinary sanctions, which can only be imposed at Tier III hearings, have a sufficient liberty interest at stake to invoke the due process protections established in *Wolff.*

Construing *Sandin,* the Second Circuit has noted that *"Sandin* may be read as calling into question the continuing viability of our cases holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation." *Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995). Consistent with other district courts in this Circuit, this Court finds that the Second Circuit's reading of *Sandin* in *Rodriguez* "should apply with equal force to Second Circuit precedent on state-created liberty interests in freedom from punitive segregated confinement." *Rosario,* 1995 WL 764178, at *4. Thus, this Court cannot conclude that Scott has a protected liberty interest at stake without analyzing the facts under *Sandin* to determine whether Scott's confinement amounts to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin,* —— U.S. at ——–——, 115 S.Ct. at 2300–01.

### ii. *Scott's Claim*

Applying the analysis developed in *Sandin,* this Court is not persuaded that Scott's 60–day confinement in the A2–SHU constitutes an "atypical or significant hardship" sufficient to create a liberty interest protected by the Due Process Clause. First, the evidence does not establish, nor does plaintiff argue, that Scott's disciplinary segregation adversely affected the duration of his sentence. In addition, Scott has not demonstrated that his confinement differed materially in either duration or degree of restriction from the confinement of those inmates assigned to the A2–SHU for non-disciplinary reasons.

Scott argues that his confinement in the A2–SHU had a dramatic, negative effect on his freedom and privileges. Specifically, Scott alleges that he was locked in his cell for 23 hours a day, that his access to the law library was severely limited, that his recreation was restricted to one hour a day, and that he was allowed only two ten-minute showers a week. Scott contrasts this with his experience in the general population at Green Haven, where he spent 13 hours a day

out of his cell and had unrestricted access to facility services, including the law library. Under *Sandin,* however, this Court must compare the conditions of Scott's disciplinary confinement in the SHU to the conditions of confinement of inmates held in the SHU for non-disciplinary reasons in order to determine whether Scott's confinement constitutes an "atypical and significant hardship."

New York prison regulations provide that inmates may be placed in the SHU for disciplinary confinement, detention, administrative segregation, protective custody, keeplock confinement, and "for any other reason, with the approval of the deputy commissioner for facility operations." 7 N.Y.C.R.R. §§ 301.1–301.7. All inmates housed in the A2–SHU under this provision, regardless of the reason for their segregation, are subject to the restrictions on privileges described by Scott.[4] Thus, while Scott's segregation in the A2–SHU limited the freedom he enjoyed in the general population at Green Haven, his confinement "did not exceed similar, but totally discretionary confinement in ... degree of restriction." *Sandin,* — U.S. at ——, 115 S.Ct. at 2301.

Scott further argues that because he spent two months in disciplinary segregation while the plaintiff in *Sandin* was confined to the SHU for only 30 days, this Court cannot determine as a matter of law that Scott's segregation did not amount to an "atypical and significant hardship." The relevant consideration before this Court, however, is whether the duration of Scott's segregated confinement differs materially from the length of the terms served by inmates in the A2–SHU for reasons other than discipline. *See Rosario v. Selsky,* 94 Civ. 6872, 1995 WL 764178, at *5 (S.D.N.Y. Dec. 28, 1995). In New York, an inmate may be placed in the SHU "for such period as may be necessary for maintenance of order or discipline." 7 N.Y.C.R.R. § 301.7. Prison regulations provide no limits on the duration of SHU time that can be imposed on a prisoner at a Tier III hearing for either disciplinary or administrative reasons, and in fact, lengthy terms of confinement in the SHU are common. Thus, while Scott spent more time in segregated confinement than did the plaintiff in *Sandin,* there is no evidence that Scott's confinement improperly "exceed[ed] similar, but totally discretionary confinement in ... duration." *Sandin,* — U.S. at ——, 115 S.Ct. at 2301.

Moreover, the Court in *Sandin* suggested that whether the duration of segregated confinement constituted an atypical and significant hardship depended not only on the length of confinement, but also on what percentage of the inmate's total sentence that confinement represented. *See Rosario,* 1995 WL 764178, at *5. In light of the fact that Scott has been incarcerated since 1984, the time he spent in the A2–SHU represents an insignificant proportion of his time under sentence, and thus cannot be characterized as "a major disruption in his environment." *Sandin,* — U.S. at ——, 115 S.Ct. at 2301; *see also Santana v. Keane,* No. 90 Civ. 6309, 1996 WL 465751, at *5 (S.D.N.Y. Aug. 14, 1996); *Rosario,* 1995 WL 764178, at *5.

Following *Sandin,* many district courts within the Second Circuit have held as a matter of law that confinements similar to or more restrictive than Scott's 60–day confinement in the A2–SHU do not constitute an "atypical or significant hardship" implicating a constitutionally protected liberty interest. *See, e.g., Frazier v. Coughlin,* 81 F.3d 313, 317–18 (2d Cir.1996) (12 days in SHU is not a "significant deprivation of a liberty interest"); *Webb v. Artuz,* No. 93 Civ. 5985, 1996 WL 452260, at *4 (S.D.N.Y. Aug. 8, 1996) (45 days in keeplock does not create a liberty interest of "real substance"); *Trice v. Clark,* 94 Civ. 6871, 1996 WL 257578, at *3 (S.D.N.Y. May 16, 1996) (150 days in SHU does not amount to a constitutional violation); *Arce v. Coughlin,* 93 Civ. 4702, 1996 WL 252371, at *7 (S.D.N.Y. May 14, 1996) (120

---

4. As Scott contends and defendants concede, inmates in protective custody receive slightly more privileges than other inmates in the A2–SHU, such as more out of cell time and access to the Family Reunion Program. *See* 7 N.Y.C.R.R. § 330.4. These additional privileges are insufficient evidence to persuade this Court that the conditions of disciplinary segregation are different enough from the conditions of segregation for other reasons as to make Scott's confinement in the A2–SHU "a dramatic departure from the basic conditions" of his sentence. *Sandin,* — U.S. at ——, 115 S.Ct. at 2301.

days in SHU during 22 year term of imprisonment was not an "atypical and significant hardship"); *Rivera v. Coughlin,* 92 Civ. 3404, 1996 WL 22342, at *5 (S.D.N.Y. Jan. 22, 1996) (89 days in keeplock does not constitute an "atypical or significant hardship"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y. 1995) (45 days in keeplock does not give rise to a § 1983 claim); *Rosario,* 1995 WL 764178, at *5 (85 days in SHU does not impose an "atypical and significant hardship"). *But see Bishop v. Keane,* 92 Civ. 6061, 1995 WL 384443, at *3 n. 4 (S.D.N.Y. June 28, 1995) (whether 87 days in keeplock imposes an "atypical or significant hardship" is a question of fact); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1106 (S.D.N.Y.1995) (two years in SHU and loss of good time credit constitutes a protected liberty interest); *Lee v. Coughlin,* 902 F.Supp. 424, 431 (S.D.N.Y.1995) (376 days in SHU violated a protected liberty interest). Because his 60-day confinement in the A2–SHU does not amount to an "atypical or significant hardship," Scott has no protected liberty interest in freedom from that confinement, and thus is not entitled to the procedural protections set forth in *Wolff.*

Since Scott has failed as a matter of law to establish a due process claim, defendants are entitled to summary judgment. In view of this conclusion, the Court need not consider defendants' other arguments in support of their motion for summary judgment.

### B. *All Other Pending Motions*

Because *Sandin* is dispositive of all of the claims remaining in this action, defendants are entitled to summary judgment. Accordingly, this Court declines to address the arguments in support of defendants' motion to amend their answer and plaintiff's motion for partial summary judgment, and both motions are denied as moot.

### CONCLUSION

For the foregoing reasons, plaintiff's motion to amend his complaint to add Selsky as a defendant is granted, defendants' motion for summary judgment is granted, and the amended complaint is dismissed. Defendants' motion to amend their answer and plaintiff's motion for summary judgment are denied as moot.

It is so ordered.