Harold SCOTT, Plaintiff,

v.

Thomas A. COUGHLIN, III, et al., Defendant.

No. 90 Civ. 0494(RJW).

United States District Court, S.D. New York.

Jan. 14, 2000.

Laurent A. Sacharoff, New York City, for plaintiff.

Vincent Leong, Assistant Attorney General, New York City, for defendant.

## OPINION

ROBERT J. WARD, District Judge.

Defendants have moved, pursuant to Fed.R.Civ.P. 56(c), for summary judgment. For the reasons hereinafter stated, defendants' motion is granted in part and denied in part.

**1.** Defendants consisted of Thomas A. Coughlin, Commissioner, Department of Correctional Services; Charles Scully, Superintendent, Green Haven Correctional Facility; R. Seitz, Deputy Superintendent; C.R. Winch. First Deputy Superintendent; J. Tanner, Corrections Captain; S. Albury, Corrections Sergeant; J.A. Wilcox, Corrections Officer; Gordon LaBonte, Corrections Officer; K. Erickson, Corrections Officer; J.R. Novak, Corrections Officer; and N.K. Howe, New York State Police Investigator.

## Background

On January 22, 1990, Scott filed the present action pro se under 42 U.S.C. §§ 1983 and 1985, charging eleven defendants with violating his constitutional rights while he was an inmate at the Green Haven Correctional Facility.[1] The facts in this case are set forth in detail in *Scott v. Albury,* 156 F.3d 283 (2d Cir.1998) and *Scott v. Coughlin,* 944 F.Supp. 266 (S.D.N.Y.1996). Nevertheless, a brief review of the facts relevant to the present motion and the procedural history in this case follow.

On November 7, 1986, while conducting a search of plaintiff's cell, Corrections Officer John R. Novak allegedly found a "shank," or home-made knife hidden in one of the legs of plaintiff's bed. A misbehavior report against plaintiff was filed the same day by Novak, charging Scott with possession of a weapon. Novak also reported the incident to the New York State Police. As a result, State Police Investigator Nelson Howe charged Scott with criminal possession of a weapon and promotion of prison contraband.

A disciplinary hearing was held on November 13, 1986 to determine whether Scott was guilty of the allegations made in Novak's misbehavior report. The hearing was conducted by Patrick McGann, a Deputy Superintendent at Green Haven. At the conclusion of the hearing, McGann found plaintiff guilty of the weapons charge and sentenced him to 45 days keeplock confinement, 30 days of which were deferred. Scott subsequently filed an administrative appeal, but his appeal was denied.[2]

**2.** Scott challenged the outcome of his hearing and administrative appeal in an Article 78 proceeding brought in New York State Supreme Court. Defendants did not contest plaintiff's petition and therefore, the state court granted Scott's Article 78 petition without reaching the merits. The incident was expunged from plaintiff's record.

**304**

On January 22, 1987, Scott was produced before the Beekman Town Justice Court (hereinafter the "Beekman Court") to be arraigned on the criminal charges filed against him by Howe. Believing that he could not be compelled to appear without a written court order, plaintiff refused to enter the courtroom. That evening Corrections Officer Gordon LaBonte served plaintiff with a second misbehavior report, charging him with disobeying a direct order and interfering with corrections officers.[3]

On January 28, 1987, Joseph Tanner, Corrections Captain, presided over Scott's second disciplinary hearing. Tanner found plaintiff guilty of the charges alleged in LaBonte's report and sentenced him to 60 days keeplock confinement. Although sentenced to keeplock, plaintiff states that he was confined to the more restrictive A2–Special Housing Unit ("SHU").[4] Plaintiff appealed Tanner's ruling following the hearing. This appeal was denied.[5]

\* \* \* \* \* \*

Scott originally set forth ten claims in his complaint. Claims one, two, eight, nine, and ten alleged that defendants violated Scott's rights to due process and equal protection by producing him before the Beekman Court without a court order. Claims three, four and five asserted that plaintiff's two disciplinary hearings did not comply with the requirement of due process because Scott was deprived of a fair and impartial hearing officer, denied the right to call witnesses and present evidence, and was not provided with the nec-

essary witness refusal forms. Claim six alleged that plaintiff's second disciplinary hearing was instituted in retaliation for Scott's exercise of his constitutional rights. Finally, claim seven asserted that certain defendants conspired to have Scott falsely charged and prosecuted for possession of a weapon and promotion of prison contraband.

On July 25, 1990, this Court granted defendants' motion to dismiss plaintiff's five claims arising out of the Beekman Court incident. *Scott v. Coughlin,* No. 90 Civ. 494 (RJW), 1990 WL 108383 (S.D.N.Y. July 26, 1990). The Court found that Scott's constitutional rights were not violated as a result of his compelled production because Scott did not possess a liberty interest in being produced only with a court order.[6]

Then, on March 19, 1991, this Court granted defendants' first motion for summary judgment as to those portions of plaintiff's remaining claims which asserted that defendants violated Scott's constitutional rights by denying his request present evidence at his two disciplinary hearings. *Scott v. Coughlin,* No. 90 Civ. 494, Hon. Robert J. Ward, Memorandum Decision, dated March 19, 1991. In its ruling, the Court noted that an inmate's request for evidence may be denied where the evidence would be irrelevant to the proceedings. The Court went on to find that there were no genuine issues of material fact regarding the relevance of the requested evidence and concluded that de-

---

**3.** Scott's subsequent trial on the criminal charges resulted in a mistrial. The state then moved to dismiss the case and the motion was granted.

**4.** Defendants contest plaintiff's assertion that the unit where he was held was a SHU. However, Scott has presented considerable evidence that the unit where he was confined was indeed a Special Housing Unit. He has submitted a court decree in place at the time of his sentence defining the A2 unit as a SHU and provided copies of the decree and SHU rules that he was given upon his admission to the A2 unit. Even if the unit where Scott was

held was technically called keeplock, defendants do not dispute that Scott was subjected to the same restrictions as those confined to SHU. For purposes of this motion, then, the Court will treat Scott as though he were sentenced to a Special Housing Unit.

**5.** Scott also filed an Article 78 proceeding challenging the outcome of his second disciplinary hearing. His petition was denied.

**6.** This decision effectively dismissed all claims against Wilcox and Erickson.

fendants were entitled to judgment as a matter of law.

Defendants filed a second motion for summary judgment in 1995 on the surviving claims, all of which alleged various due process violations. Without reaching the merits of these claims, the Court granted defendants' motion and dismissed the complaint. *Scott v. Coughlin,* 944 F.Supp. 266 (S.D.N.Y.1996). The Court found that under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), Scott could not assert a claim for denial of due process because his sixty-day confinement to SHU did not implicate a liberty interest triggering due process protection.

On March 9, 1998, the United States Court of Appeals for the Second Circuit vacated this Court's decision, finding that the Court, in its *Sandin* analysis, erroneously relied on the New York Prison regulations in place at the time of the court's decision, rather than at the time of Scott's SHU confinement. *Scott v. Albury,* 156 F.3d 283 (2d Cir.1998). The Second Circuit, therefore, remanded the case and directed this Court to analyze Scott's due process claims in light of the earlier regulations.

Currently before the Court is defendants' renewed second motion for summary judgment on plaintiff's remaining five claims. These claims include: (1) denial of plaintiff's right to a fair and impartial hearing officer at the Tanner hearing brought against Tanner, LaBonte, Albury, Scully, and Coughlin (Claim Three); (2) denial of the right to call witnesses at the Tanner hearing alleged against the same defendants (Claim Four); (3) denial of plaintiff's right to witness refusal forms at the Tanner hearing against Tanner, Scully, and Coughlin (Claim Five); (4) denial of the right to be free from retaliation for asserting due process rights brought

against Coughlin, Scully, Seitz, Tanner, Winch, Albury, and LaBonte (Claim Six); and (5) denial of the right to be free from false charges and prosecution against Novak, Howe, and Scully (Claim Seven).[7]

In support of their motion for summary judgment, defendants reargue the *Sandin* issue based on the earlier regulations. They also assert that even if the Court finds that plaintiff does possess a liberty interest triggering due process protection, they are nevertheless entitled to summary judgment because defendants lack the requisite personal involvement to be held liable, are entitled to qualified immunity, and did not violate plaintiff's constitutional rights. For the following reasons, defendants' motion is granted in part and denied in part.

### Discussion

A motion for summary judgment may only be granted if the court determines that there is no genuine issue of material fact to be tried and that the facts warrant judgment for the moving party as a matter of law. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). The party seeking summary judgment bears the burden of showing that no genuine issue of material fact exists and in determining whether there is a genuine issue as to any material fact, the Court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993).

### I. Sandin v. Connor

To prevail on a § 1983 claim, a prison inmate must first show that he possessed a protected liberty interest and that he was deprived of that interest without due process of law. The Supreme Court has held that disciplinary confinement,

---

**7.** In 1996, the Court granted plaintiff's motion to amend his complaint to add defendant Donald Selsky, Department of Corrections' Director of Special Housing/Inmate Disciplinary Program. However, plaintiff never filed an amended pleading outlining what his claims were against the new defendant. Accordingly, the Court does not address Selsky in this decision.

such as Scott's sixty-day SHU sentence, does not create a protected liberty interest triggering due process protection unless the confinement imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

As the Second Circuit has recently explained, after *Sandin*, a prisoner has no actionable due process claim if other prisoners typically experience approximately the same deprivation as a result of the "ordinary administration of the prison." *Welch v. Bartlett*, 196 F.3d 389, 392 (2d Cir.1999).[8] Due process claims are reserved instead for those prisoners who endure hardships that are "substantially more grave" than those hardships that prisoners would ordinarily experience as members of the general prison population. *Id.*

■ Due to confusion among the district courts, the Second Circuit has recently attempted to clarify what factors should be considered in conducting the *Sandin* analysis. To this end, the Second Circuit has directed district courts to engage in extensive fact-finding as to the specific conditions of the inmate's disciplinary confinement. *Ayers v. Ryan*, 152 F.3d 77, 83 (2d Cir.1998); *Brooks v. DiFasi*, 112 F.3d 46, 49 (2d Cir.1997). In determining whether these conditions create a "significant and atypical hardship," the Second Circuit has stated that district courts should compare the specific conditions of the inmate's confinement to both the conditions in the general population as well as those in other types of segregated confinement. *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir.1998);

*Spaight v. Cichon*, 1998 WL 852553 *1, 166 F.3d 1201 (2d Cir. Dec. 8, 1998).

■ Most recently, the Second Circuit has noted that the duration and frequency of SHU confinement are "highly relevant" to the *Sandin* analysis. *Welch*, 196 F.3d at 394. However, the court cautioned that in considering the duration of confinement the proper comparison is *not* between plaintiff's SHU sentence and the SHU terms received by others who were also confined for disciplinary reasons. *Id.* Instead, "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration. . . ." *Id.*

■ Similarly, with respect to frequency, the Second Circuit in *Welch* suggested that instead of looking at how often inmates are sentenced to disciplinary SHU, district courts should consider the frequency with which inmates spend 'comparable periods of time confined to SHU for non-disciplinary reasons. *Id.* ("How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable privation in the ordinary administration of the prison."); *See also Brooks*, 112 F.3d at 49 (stating "the mere fact that New York's prison regulations permit extended administrative segregation does not tell how frequently or for what durations such segregation is imposed").

Pursuant to the Second Circuit's recent pronouncements on this issue, in determining whether Scott's sixty days in SHU amounts to an atypical and significant

---

**8.** What is meant in *Welch* by deprivation or confinement as a result of "the ordinary administration of the prison" is unclear. The court indicated that such confinement includes administrative segregation as well as protective custody. However, it did not lay out what other forms of confinement might by considered under this heading. This Court understands the phrase to refer to all confinement that is part of the day to day management or administration of the prison. Since the Court does not know of any type of confinement, other than that imposed for disciplinary reasons, which is not related to the daily administration of the prison, the Court will use the phrase confinement in "the ordinary administration of the prison" interchangeably with "non-disciplinary confinement."

hardship, the Court must compare (1) the conditions of Scott's disciplinary confinement with the conditions in the general prison population, (2) the conditions in disciplinary confinement with those in other types of segregated confinement and (3) the duration of Scott's confinement with the typical period of confinement for those placed in SHU for non-disciplinary reasons. Along with duration, the Court must examine the frequency with which inmates are confined to SHU in the ordinary course of the prison administration.

## A. Conditions in Disciplinary SHU Compared to those in the General Population

█ Scott alleges that his sixty days confined to SHU constituted an atypical and significant hardship when compared to the ordinary incidents of prison life. Prior to his confinement in SHU, Scott spent approximately thirteen hours a day out of his cell, during which he engaged in a regular program of work, study, and exercise. Declaration of Harold Scott in Opposition to Defendants' Motion to Reargue and Renew Their Second Motion for Summary Judgment, dated May 25, 1999 ("Scott Decl."), ¶ 30. He attended classes every morning and had registered prior to his confinement in SHU to take courses at Dutchess County College. Scott Decl. ¶¶ 32 & 38.

As a member of the general prison population, Scott participated in a work program each afternoon, earning $13 every two weeks. Scott Decl. ¶ 33. On most days after his work program ended, Scott went to the law library. Scott Decl. ¶ 34. During this time, he worked on the appeal of his conviction, learned research methods in an inmate program called PACT, and received his legal research certificate. Scott Decl. ¶¶ 37 & 46. In addition to these activities, Scott ate his meals in the mess hall where he socialized with the other inmates. Scott Decl. ¶ 31 & 32. On the weekends, Scott spent his time cleaning his cell, exercising, and watching television. Scott Decl. ¶ 36. He was permitted to move relatively freely within the prison, always without handcuffs and leg irons, sometimes in large groups, and other times unescorted. Scott Decl. ¶ 40.

Once he was placed in SHU, most of these activities were suspended or greatly restricted. Scott was confined to his cell for twenty-three hours a day. Scott Decl. ¶ 44. He was given only one hour of exercise each day in a yard which had no recreation or exercise equipment. Scott Decl. ¶¶ 44 & 47. No more than four inmates were permitted in the yard at one time. *Id.* Regardless of the weather, Scott was given just one layer of clothing at recreation. By contrast, inmates in general population were permitted to exercise in a separate yard, with equipment, for up to four hours a day and had recreation inside during the winter months. Scott Decl. ¶ 48.

As a result of his confinement, Scott was no longer allowed to go to the law library and was only permitted to check out a total of four law books and other legal materials at one time. Scott Decl. ¶ 45. He was unable to attend his classes or take the courses he had signed up for at Dutchess County College. Scott lost his job as well as his pay rate and no other work or cell study programs were available to him. Scott Decl. ¶¶ 42 & 45. He was required to eat all of his meals alone in his cell. Although he was supposed to receive the same quantity of food as general population inmates, 7 N.Y.C.R.R. § 301.4(a), Scott maintains that his food rations were smaller and were sometimes cold. Scott Decl. ¶ 53.

While the number of visits permitted were the same for Scott as all other inmates, he was required to use the old visiting room which had a waist-high partition separating inmates from their visitors. There was no free movement in the room except to use the bathroom and take pictures. Scott was only allowed to hug and kiss visitors at the beginning or end of his visits. Scott Decl. ¶ 50. This description

stands in stark contrast to the general freedom of movement and conduct permitted in the visiting room used by the other inmates where inmates could sit with their visitors without any obstruction, were allowed to hug and kiss visitors at any time, and could even walk outside with visitors to an area with tables. Scott Decl. ¶ 51.

Once confined to SHU, Scott was escorted by a security officer every time he moved outside of his cell. Sometimes he was handcuffed. Scott Decl. ¶ 52. He was not allowed to talk to other inmates when he was moving from his cell to another location in the prison. *Id.*

As an inmate in SHU, Scott was allowed only two ten-minute showers a week while those in general population were permitted three twenty minute showers. Scott Decl. ¶ 53. Although general population inmates had access to their personal property, Scott was restricted in the kinds of possessions he could keep with him in his cell. Finally, Scott explains that the SHU unit was incredibly noisy because the inmates in the mental health unit directly above him would bang on the walls and slam their beds against the floor during the night. Scott Decl. ¶ 54.

Having examined the SHU regulations, affidavits, and supporting documents relating to this motion, the Court finds that the conditions of Scott's confinement were qualitatively different from those experienced by inmates in the general population. Inmates in the general prison population spent up to thirteen hours out of their cell a day, socializing with other inmates, taking classes, working, exercising, showering, and visiting with family and friends. However, these activities were se-verely limited and restricted for Scott. He could not interact with other inmates, take classes, or have a job. His opportunity to exercise and shower was significantly curtailed. Even his work on his criminal appeal and his visits with loved ones were affected. Most significantly, Scott was confined to his cell without his personal possessions for twenty-three hours every day. Such conditions are clearly a significant hardship when compared to the ordinary incidents of prison life.[9]

Nevertheless, in determining whether such deprivations are sufficiently severe to trigger due process protection, this Court must also determine whether they are atypical. To do so, the Court must compare the conditions in disciplinary SHU to those in non-disciplinary SHU and consider these conditions in light of the duration and frequency of confinement resulting from the ordinary administration of the prison.

## B. Conditions in Disciplinary SHU Compared to those in Other Types of Segregated Confinement

Under the 1987 DOCS regulations governing SHU confinement, an inmate could be placed in SHU for both disciplinary and non-disciplinary reasons. The regulations provided for three different kinds of non-disciplinary admission to SHU: automatic admission, protective admission, and detention admission. 7 N.Y.C.R.R. § 304.1 (1987). In 1987, an inmate could be placed in SHU as an automatic admission when SHU was being used as a reception, temporary detention or diagnosis and treatment center, to house work gangs or in-

---

**9.** Defendants suggest that the conditions in SHU and in the general prison population do not differ dramatically since those in the general population spend significant amounts of time confined to their cells as well. In support, defendants note that inmates spend eight hours in their cells during sleeping hours and between twenty to forty minutes in their cells for master counts which occur four times a day. In addition, defendants remark, inmates are sometimes confined to their cells for facility wide or partial "lockdown" when prison officials are investigating inmate disturbances. Even assuming for purposes of the *Sandin* analysis that inmates do spend all of this time confined to their cells, the Court agrees with the Second Circuit that "[a]lthough confinement to one's cell for half the day has some similarity to such confinement for 23 hours a day, the difference seems ... to be great." *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir.1999).

mates assigned to work release programs, to provide a place for those inmates who were physically unable to participate in the programs of the facility, and to temporarily keep inmates for purposes of evaluation and reclassification. *Id.* at § 304.1(a).

Inmates could be placed in SHU as protective admissions if they were potential victims, were witnesses who might be intimidated, lacked the strength to live in the general institutional community, had violent emotions that were out of control or had to be restricted from communication with the general inmate population. *Id.* at § 300.3(b)(3) (1987). Protective admissions included inmates who agreed to be placed in protective custody as well as those who were placed in SHU involuntarily.

Finally, detention admission could be employed in the case of inmates who were awaiting appearance before or determination of a disciplinary hearing or superintendent's hearing or inmates who had been received from another facility where their record in the other facility raised a reasonable question as to whether they would adhere to the department's rules and policies governing inmate behavior. *Id.* at § 304.1(c).

In 1987, all inmates housed in SHU, with the exception of those in involuntary protective custody, were subject to the same conditions of confinement and restrictions on activities. Supplemental Affidavit of Donald Selsky, ("Supp. Selsky Aff.") dated Nov. 5, 1999, ¶¶ 6–9. Therefore, all SHU inmates spent twenty-three hours a day in their cells with one hour

reserved for outdoor exercise, were not allowed to participate in educational or work programs, and were denied physical access to the libraries. Inmates confined to SHU, whether for disciplinary or non-disciplinary reasons, were restricted in the personal possessions they were allowed to keep with them in their cells. They all had to eat their meals alone in their cells and were allowed fewer and shorter showers than those in general population.

Inmates who were involuntarily placed in protective custody ("IPC"), however, were given more liberties than other SHU inmates. In 1987, IPC inmates were entitled to a minimum of three hours a day outside of their cell, rather than the maximum one hour afforded other SHU inmates. Supp. Selsky Aff. ¶ 9. While one of the three hours granted to IPC inmates was designated for outdoor activity, the other two hours could be used for visits, meals, showers, recreation, telephone calls or entertainment. *Id.* In addition, IPC admissions were allowed to participate in cell study programs and were permitted to retain their personal property. Selsky Aff. ¶ 10.[10]

■ Having considered the specific conditions of Scott's confinement and compared them to those in the general population and in non-disciplinary SHU confinement, the Court finds that, with the exception of involuntary protective custody, disciplinary segregation in 1987, "mirrored" those conditions imposed upon inmates in non-disciplinary SHU confinement.[11]

---

**10.** It is unclear whether the more lenient conditions imposed on those in IPC extended to inmates who were voluntarily confined to protective custody. Selsky refers only to IPC in his affidavit. However, it is difficult to imagine that those who were admitted willingly endured more significant deprivations than those who refused to be so confined.

**11.** The Second Circuit, in *Wright v. Coughlin,* 132 F.3d 133 (2d Cir.1998), suggested that access to periodic reviews for those who are administratively assigned to SHU "might differentiate disciplinary from administrative

confinement" and provide a basis for finding that disciplinary SHU is an atypical and significant hardship. *Id.* at 137. The Court does not find that such review sufficiently differentiates disciplinary confinement from other kinds of segregation. The review afforded certain SHU inmates, such as those in protective custody and some of the inmates confined as detention admissions, is necessary because those inmates do not receive initial hearings to determine the appropriate length of confinement or because such a determination can only be made on a short term basis.

This finding suggests that Scott may not possess a protected liberty interest triggering due process protection, because other inmates suffer the same conditions for non-disciplinary reasons. *See Sandin v. Conner,* 515 U.S. 472, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (finding no liberty interest in 30 day disciplinary confinement, in part, because the conditions of such confinement "mirrored" those imposed on inmates in administrative segregation and protective custody). However, in order to complete the *Sandin* analysis, the Court must also look at how frequently other inmates experience such deprivations and for how long.

## C. Duration and Frequency

In conducting this final part of the analysis, the Court must measure the duration of plaintiff's sentence against periods of comparable deprivation typically endured by inmates placed in SHU for non-disciplinary reasons and examine the frequency with which the general population spends time in SHU as a result of the ordinary administration of the prison. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999).

In their initial papers, neither defendants nor plaintiff provided the necessary information for evaluating the duration and frequency of non-disciplinary confinement. Therefore, the Court directed the parties to furnish any statistics kept by DOCS reflecting the duration and frequency of non-disciplinary admissions to SHU in 1987 or for the first year that such statistics were available. In response, defendants provided the 1992 figures for admissions to administrative segregation and involuntary protective custody.

After reviewing these statistics, the Court finds that there are genuine issues of material fact which prevent it from completing the *Sandin* analysis. First, although the Court recognizes that defendants could not have submitted statistics for any years prior to 1992, since they do not exist, the parties have not provided the Court with any evidence that the 1992 figures reflect the frequency and duration of non-disciplinary confinement in 1987, the year Scott was confined to SHU. As such, the Court cannot reasonably draw any inference from these numbers regarding the typicality or atypicality of Scott's confinement.

Second, the Court is not convinced that statistics for administrative segregation and protective custody help the Court determine whether inmates in the general population typically endure similar deprivations as Scott for similar amounts of time.

The current regulations provide for administrative segregation to house inmates whose "presence in general population would pose a threat to the safety and security of the facility." Affidavit of Donald Selsky ("Selsky Aff."), dated April 29, 1999, ¶ 22. However, administrative segregation did not exist as a category of confinement in 1987. Selsky asserts that prison officials nevertheless had the ability to place such inmates in SHU in 1987. According to Selsky, they were simply confined under the category "protective admissions." However, protective admissions provided for the confinement of inmates who should "be restricted from communication with the general population." *Id.* Since the descriptions of these two types of confinement differ, the Court is not convinced that protective admissions

By contrast, disciplinary admissions receive a hearing during which prison officials assess the proper length of sentence based on the infraction. There is no need for periodic review since inmates placed in SHU for disciplinary reasons receive sentences for specific periods of time. *See Husbands v. McClellan,* 990 F.Supp. 214, 218 n. 2 (W.D.N.Y.1998)

(finding the differences in availability of review between administrative and disciplinary confinement insignificant in determining whether sentence amounts to an atypical and significant hardship); *Wright v. Coughlin,* 31 F.Supp.2d 301, 322–323 (W.D.N.Y.1998) (on remand) (same).

was actually used by prison officials in the same way that administrative segregation is used today.

As for the use of the statistics for IPC, Selsky acknowledged in his affidavit that the conditions in IPC differ from those in SHU. Supp. Selsky Aff. ¶ 5. As discussed earlier, IPC inmates are given at least three hours each day out of their cell, they can keep their personal possessions, and are allowed to participate in cell study programs. Moreover, IPC inmates can use their free time for visits, meals, showers, recreation, telephone calls or entertainment. The Court finds these differences to be significant and to far outweigh the similarities between the conditions in IPC and disciplinary SHU.

Since the conditions in IPC do not "mirror" those endured by other inmates in SHU and administrative segregation did not exist in 1987, these two categories do not help the Court determine whether "prisoners experience approximately the same deprivation [as plaintiff] in the ordinary administration of the prison with sufficient regularity [to make] such deprivation typical." *Welch,* 196 F.3d at 392.[12]

In light of the above, genuine issues of material fact exist as to which categories of non-disciplinary confinement are relevant and what the statistics for SHU confinement in 1992 suggest about SHU confinement in 1987. As such, the Court is unable to evaluate the duration and frequency of confinement resulting from the ordinary administration of the prison as required by *Welch.*

Without this evaluation, the *Sandin* analysis is incomplete. The Court cannot determine whether the deprivation endured by plaintiff is an atypical hardship unless it knows how often members of the general prison population experience similar deprivations for similar amounts of time as a result of ordinary prison administration. *See Welch,* 196 F.3d at 393 (reversing the district court in part for failure to consider typical duration of non-disciplinary confinement and noting that the frequency with which inmates are confined

---

12. Even if the Court did believe that these statistics were relevant, it would still deny defendants' motion for summary judgment on the *Sandin* issue. The statistics show that in 1992, there were 166 admissions to administrative confinement. Forty-six of these 166 admissions were for terms of sixty days, the length of Scott's sentence, or more. Supp. Selsky Aff.Ex. 1. Out of 61,736 inmates in DOCS on December 31, 1992, then, 0.27% were placed in administrative confinement that year and only 0.07% of them were administratively confined to SHU for the same period of time as Scott or longer. Affidavit of Laurent A. Sacharoff in Opposition to Defendants' Motion to Renew and Reargue their Second Motion for Summary Judgment ("Sacharoff Aff."), dated June 11, 1999, Ex. 13.

These figures also show that for the same year, 1992, there were 691 admissions to SHU for involuntary protective custody. Out of these 691 admissions, 297 were for sixty days or more. Supp. Selsky Aff., Ex 2. When compared to the total number of inmates in DOCS that year, the number of admissions to SHU for involuntary protective custody was 1.1% of the prison population, and only 0.48% of the prison population was placed in involuntary protective custody for sixty days or longer. Sacharoff Aff., Ex. 13.

Combining the numbers for administrative segregation and involuntary protective custody, the statistics show that 1.58% of the entire DOCS population in 1992 endured conditions similar to Scott for non-disciplinary reasons and only 0.55% endured such conditions for the same period of time as Scott or longer. Since these figures represent such a small percentage of the total prison population, the Court does not believe that they can support a finding that it is "an ordinary incident of prison life" to spend twenty-three hours each day confined to a cell, with one hour for exercise, no work or educational programs, restricted library access, two ten minute showers a week, and little or no interaction with other inmates.

The Court recognizes that these statistics only reflect two categories of non-disciplinary confinement. However, because these percentages are so low, the Court finds it difficult to imagine that adding the other non-disciplinary SHU admissions, such as automatic admissions or those in voluntary protective custody, would yield a total percent substantial enough to make such confinement "typical" of prison life.

as a result of the ordinary administration of the prison is also relevant). Consequently, defendants' motion for summary judgment on the ground that plaintiff does not have a protected liberty interest in avoiding disciplinary confinement is denied.

Since the Court is unable to determine at this time whether Scott has a liberty interest triggering due process protection, the Court will turn to defendants' alternative arguments in support of their motion for summary judgment.

**II. Personal Involvement**

Defendants argue that even if plaintiff has a liberty interest entitling him to due process protection, he has failed to allege sufficient personal involvement on the part of Coughlin, Scully, Winch, and Seitz to make them liable under Section 1983. The Court agrees.

■ It is well settled that "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). A defendant will be found personally involved for purposes of § 1983 liability when the defendant directly participated in the infraction. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). When the defendant did not participate in the infraction, but is a supervisory official, the defendant can also be held liable if he (1) learned of the violation through a report or appeal and failed to remedy the wrong, (2) created or continued a policy or custom under which unconstitutional practices occurred, or (3) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* at 323–24.

■ Scott filed two appeals challenging the outcome of his disciplinary hearings. Both of these appeals were addressed to Coughlin, the Commissioner of DOCS. However, Coughlin did not review the appeals himself. Rather, he forwarded them to Selsky, the Director of the Special Housing/Inmate Disciplinary Program. There is no evidence that Coughlin actually knew of the alleged constitutional violations or of Selsky's decision to deny the appeals. That Coughlin received and forwarded Scott's appeals, without more, is insufficient to establish the requisite level of personal involvement to invoke liability under § 1983. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (affirming dismissal of claims against Coughlin where only involvement was receiving and forwarding appeal to Selsky and responding to a status inquiry); *Parris v. Coughlin,* No. 90–CV–414, 1993 WL 328199 *3 (N.D.N.Y. Aug. 24, 1993) (finding insufficient evidence to establish Coughlin's personal involvement where Selsky acted as Coughlin's agent in plaintiff's appeal). Furthermore, Scott has failed to allege sufficient facts to show that Coughlin directly participated in the constitutional violations, created or continued a policy or custom under which unconstitutional practices occurred, or was grossly negligent in supervising subordinates. Therefore, the claims against Coughlin cannot survive defendants' motion for summary judgment.

■ As for defendants Scully, Seitz, and Winch, who held the positions of Superintendent, Deputy Superintendent, and First Deputy Superintendent of Green Haven respectively, plaintiff claims that each was personally involved to the extent that Scott informed all of them that his due process rights were violated during his disciplinary hearings and they did nothing to remedy the wrong. While it is true that Scott informed these defendants of the alleged due process violations by Scott, Scott did not file formal complaints with them, but rather relayed his complaints to defendants in the corridors of the prison facility. Nor were these defendants in a position to act on Scott's complaints even if they had been formally filed since Selsky was the official designated to review ap-

peals from disciplinary hearings.[13] In fact, when Scott informed defendants that he had been deprived of his constitutional rights, they told him that there was nothing they could do and encouraged him to file an appeal with Selsky.

In sum, while these defendants knew of the alleged violations, their knowledge alone is insufficient to create personal involvement since they could not have remedied the wrongs complained of by Scott. As with Coughlin, there is no other basis for finding that these defendants were personally involved in the deprivation of Scott's constitutional rights.

Accordingly, defendants' motion for summary judgment is granted as to Coughlin, Scully, Seitz, and Winch.

## III. Qualified Immunity

Defendants next argue that Tanner, Albury, LaBonte, Novak, and Howe, the remaining defendants, are entitled to qualified immunity and therefore cannot be held liable for any possible violations of Scott's constitutional rights.

■ Prison officials may assert the defense of qualified immunity where their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ Plaintiff alleges that Tanner, who presided over Scott's second disciplinary hearing following the Beekman Court incident, violated his due process rights by denying his request to have certain witnesses testify. In February 1987, when the hearing took place, the law was clear that an inmate at a disciplinary hearing had a right to call witnesses in his defense, except where it would be unduly hazardous to do so or the evidence would clearly be irrelevant. *Wolff v. McDonnell*, 418 U.S. 539, 566–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Defendants nevertheless argue that Tanner is entitled to qualified immunity because he reasonably believed that the additional witnesses requested by plaintiff were irrelevant.

This Court has already found that plaintiff has raised a genuine issue of material fact as to whether Tanner was reasonable in deciding that the witnesses Scott requested were irrelevant. *See Scott v. Coughlin*, No. 90 Civ. 494, Memorandum Decision, Hon. Robert J. Ward, dated March 19, 1991 at 15–16. Since a trial is necessary to determine whether Tanner violated Scott's right to call witnesses under *Wolff*, the Court cannot conclude on summary judgment that Tanner did not violate a clearly established right of which a reasonable person would have known. Accordingly, Tanner is not entitled to qualified immunity at this time. However, the Court does find that Albury, LaBonte, Novak, and Howe are entitled to the qualified immunity defense.

■ The only factual allegations made with respect to Albury, a corrections sergeant at Green Haven, are that he was present at the Beekman Court incident and may have ordered Scott to enter the courtroom. To the extent plaintiff alleges that Albury violated his right to due process by requiring him to enter the Beekman Court, this Court has already found that such conduct does not implicate an inmate's constitutional rights. *See Scott v. Coughlin*, No. 90–Civ.–494, 1990 WL 108383 *3–*4 (S.D.N.Y. July 26, 1990). Furthermore, inasmuch as Scott alleges that Albury conspired with Tanner to deprive plaintiff of his due process rights at

---

13. While Scott did write a letter to Winch, his letter complained of his forced production before the Beekman Court without a court order. Since this Court already dismissed plaintiff's claims to the extent they allege that his constitutional rights were violated by his production before the Beekman Court, *See Scott v. Coughlin*, No. 90 Civ. 494 (RJW), 1990 WL 108383 *3–*4 (S.D.N.Y. July 26, 1990), the letter cannot form the basis for Winch's personal involvement in plaintiff's remaining claims.

his second disciplinary hearing, plaintiff has failed to state a factual basis for this claim. The record contains no indication of how Albury could have been involved in any such due process violations. Since Albury did not violate Scott's clearly established rights, he is entitled to qualified immunity.

■ The same conclusion holds true for Novak, Howe, and LaBonte. Novak is the officer who filed the initial misbehavior report against Scott charging him with a disciplinary infraction for possession of a weapon. Howe is the police investigator who signed the subsequent criminal complaint charging Scott with criminal possession of a weapon and promotion of prison contraband. LaBonte is the officer who filed the second misbehavior report against Scott following his refusal to enter the Beekman Court. Scott alleges that Novak and Howe conspired to have him falsely charged and prosecuted for possession of a weapon. However, the basis for Scott's claims against LaBonte is less clear. The only factual allegation made with respect to LaBonte is that he filed a misbehavior report against Scott. Presumably, then, Scott alleges that LaBonte, like Novak and Howe, filed a false report against him.

■ In *Freeman v. Rideout*, 808 F.2d 949 (2d Cir.1986), *petition for reh'g en banc denied*, 826 F.2d 194 (2d Cir.1987), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988), the Second Circuit held that a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Id.* at 951. As such, even if all three of these defendants filed false reports against Scott, they would be entitled to qualified immunity.

■ Nor can the claims against these defendants survive summary judgment under the theory that because they filed false charges against Scott, they are liable for any deprivation of due process occurring at the disciplinary hearings which followed. The Second Circuit has clearly established that "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir.1986).

Since there is no other evidence linking these defendants to the violations that Scott alleges took place at his disciplinary hearings, the Court cannot find that Novak, Howe, or LaBonte violated Scott's clearly established rights. They are therefore entitled to qualified immunity.[14]

## IV. Third, Fourth and Fifth Causes of Action

Plaintiff's third, fourth, and fifth causes of action all allege violations of his due process rights stemming from his second disciplinary hearing. Specifically; Scott claims that Tanner violated his constitutional rights by depriving him of a fair and impartial hearing, denying his request for additional witnesses, and failing to comply with the requirements for witness refusal forms. Defendants first argue that Scott is collaterally estopped from raising these

---

14. Defendants also contend that they are all entitled to qualified immunity because *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), illustrates that the extent to which an inmate has a protected liberty interest in avoiding segregated confinement triggering due process protection, is unclear. Whether a defendant is entitled to qualified immunity, however, depends on whether defendants' actions violated clearly established law at the time those actions were taken. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The hear-

ings which plaintiff alleges violated his constitutional rights occurred in 1986 and 1987. Up until the *Sandin* decision in 1995, "the law was clear that an inmate had a protected liberty interest in remaining free from segregated confinement and that such confinement impaired a liberty interest protected by state law." *Lee v. Coughlin*, 26 F.Supp.2d 615, 637 (S.D.N.Y.1998) (quotations and citations omitted). Therefore, defendants are not entitled to qualified immunity based on the *Sandin* decision.

due process allegations and second, that Scott's rights were not in fact violated.

### A. Collateral Estoppel

■ Under New York law, a party is collaterally estopped from relitigating an issue when "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir.1995).[15] However, the Second Circuit has cautioned that "[i]ssue preclusion will only apply if it is quite clear that these requirements have been met, lest a party be precluded from obtaining at least one full hearing on his or her claim." *Id.* (quotations and citations omitted). In this case, defendants argue that plaintiff is collaterally estopped from litigating the constitutionality of his second disciplinary hearing because this claim was already raised and dismissed in his Article 78 proceeding.

■ In his Article 78 proceeding, plaintiff sought to annul the determination made at the conclusion of his disciplinary hearing before Tanner on the grounds that the corrections officers could not lawfully produce him before the Beekman Court without a court order and therefore Scott did not commit an infraction by refusing to enter the courtroom. Scott's petition was dismissed by the court, which stated, "[p]urported impropriety in a correction officer's direction is not a defense to the charges that the petitioner either refused such direction or verbally obstructed or interfered with an employee. Accordingly, the petition fails to state a cause of action." *In the Matter of the Application of Harold Scott v. Scully*, Index No. 3428/87, Colabel-

la, J., Decision and Order, dated March 1, 1988 (citations omitted). Addressing plaintiff's claim that his due process rights were violated at his hearing, the court continued, "[b]y a parity of reasoning, petitioner's due process claims, which relate to proving the impropriety of the officer's direction, are academic." *Id.*

The Court disagrees with defendants' assertion that plaintiff's due process claims were "actually and necessarily decided" in his Article 78 proceeding. Justice Colabella's statement that such claims "are academic" reflects his determination not to reach the due process violations alleged by Scott. Even if Justice Colabella intended to reach these claims, the Court is not satisfied that his treatment of this issue is sufficient to preclude plaintiff from raising his due process claims here. As such, defendants' collateral estoppel argument must fail.

### B. Right to a Fair and Impartial Hearing

■ Plaintiff's third cause of action alleges that defendants deprived him of his due process right to a fair and impartial hearing. The Court finds that there are no genuine issues of material fact as to this claim and that defendants are entitled to judgment as a matter of law.

*Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), established that an inmate has a right to an impartial hearing officer at a disciplinary hearing. *See also Patterson v. Coughlin*, 905 F.2d 564, 569–70 (2d Cir.1990) (citing *Wolff*, 418 U.S. at 570–71, 94 S.Ct. 2963). While plaintiff's precise allegations with respect to this claim are unclear, he seems to argue that his right to a fair and impartial hearing officer was violated because

---

**15.** Although defendants' collateral estoppel defense was not raised in their answer, they moved in their first motion for summary judgment to amend their answer to include this defense. The Court did not reach the merits of this motion, denying it as moot. *See Scott v. Coughlin*, 944 F.Supp. 266, 275 (S.D.N.Y. 1996). In light of the Second Circuit decision

remanding this case for further proceedings, defendants now renew their motion to amend. Since leave to amend is to be "freely given" under Rule 15(a), Fed.R.Civ.P., and plaintiff has not shown that he would be prejudiced by allowing defendants to add the defense of collateral estoppel, the Court grants defendants' motion to amend their answer.

316

Tanner was friendly with the Beekman Court judge. As the Second Circuit has stated, however, "[b]ecause of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Therefore, Tanner's friendship with the judge does not necessarily indicate that Scott's due process rights were violated.

Since Scott has presented no evidence to suggest that Tanner's refusal to call certain witnesses or ultimate determination of guilt were influenced by his relationship with the Beekman Court judge, this Court finds no basis for holding that plaintiff was deprived of a fair and impartial hearing officer. Plaintiff simply has not provided any evidence to support such a claim. As such, defendants' motion for summary judgment as to the third cause of action is granted.

### C. Refusal of the Right to call Witnesses at the Tanner Hearing

Plaintiff alleges in his fourth and fifth causes of action that Tanner violated his due process rights at his second disciplinary hearing by refusing to call requested witnesses and failing to comply with the procedural requirement for such refusal. In ruling on defendants' first motion for summary judgment, the Court held that defendants were not entitled to summary judgment on these claims because there were genuine issues of material fact regarding whether Tanner's refusal to call the witnesses was justified. Defendants now seek to have the Court reconsider its prior ruling.

According to the "law of the case" doctrine, when a court makes a ruling on an issue of law, that ruling becomes binding on all future stages of the same litigation. However, the law of the case does not preclude a court from revisiting its own decisions prior to final judgment

especially where there has been an intervening change of controlling law, new evidence has become available, or there is a need to correct a clear error or prevent manifest injustice. *DiLaura v. Power Auth. of N.Y.,* 982 F.2d 73, 76 (2d Cir. 1992). Defendants cite two Second Circuit cases decided after the Court issued its decision which they claim weigh in favor of reconsideration. After reviewing these cases, the Court finds that they do not represent an intervening change in law nor do they indicate that the Court has committed clear error and none of the other bases for reconsideration apply.

In the first case cited by defendants, *Scott v. Kelly,* 962 F.2d 145 (2d Cir.1992), the court found that failure of a prison official to call witnesses requested by an inmate at a disciplinary hearing did not deny the inmate due process where the inmate did not advise the official what the testimony of the witnesses would be. As such, the Second Circuit explained, the hearing officer had no reason to believe that the testimony would be relevant or would affect his decision. *Id.* at 147. The court also held that the inmate's refusal to testify created such a strong presumption against him that further testimony was unnecessary. *Id.*

The decision in *Kelly,* like the decision here, is based on the holding in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) that "an official may refuse to call witnesses as long as the refusal is justified." *Kelly,* 962 F.2d at 146–47 (citing *Wolff,* 418 U.S. at 566–67, 94 S.Ct. 2963). The difference between the two decisions is that in *Kelly,* the defendants met their burden of proving that the refusal was justified while here they did not. As such, *Kelly* does not represent a change in the law. Furthermore, the outcome of *Kelly* does not suggest that this Court committed clear error since *Kelly* is distinguishable from *Scott* in several respects.

First, unlike plaintiff in *Kelly*, who did not give the hearing officer any information regarding the potential testimony of witnesses he requested, Scott told Tanner that the witnesses he wanted called were all present during, and involved in, the Beekman Court incident. As such, Scott stated that he thought their statements would be relevant to the proceedings. Based on Scott's explanation, Tanner, unlike the hearing official in *Kelly*, had reason to believe that the requested witnesses would be able to provide relevant testimony.[16]

Second, the plaintiff in *Kelly* refused to testify, creating a strong presumption against him. Here, however, plaintiff did not refuse to testify. In fact, Tanner specifically asked Scott what he had to say about the incident. In response, plaintiff stated that he did not believe "that a[sic] what ever Correction Officer that gave me a Direct Order, if one was given that he has the authority to give me a Direct Order to go into the court room." Based on this statement, Tanner could have found that plaintiff was not only arguing that he had a right to refuse any direct order requiring him to enter the Beekman courtroom, but also that a direct order was never actually given. In light of this statement by Scott, along with his assertion that the requested witnesses observed and were involved in the Beekman incident, the Court cannot say, as the Second Circuit did in *Kelly*, that plaintiff "failed to raise any questions requiring additional testimony." *Id.* at 147.[17]

Similarly, *Russell v. Selsky*, 35 F.3d 55 (2d Cir.1994), the second case defendants argue mandates revisiting this Court's prior ruling, does not weigh in favor of reconsideration. *Russell* rests on the same legal standard as *Kelly* and as this Court's prior decision in *Scott*. It does not represent an intervening change in the law weighing in favor of reconsideration. Nor does it show that this Court committed clear error.

The Second Circuit in *Russell* upheld the district court's determination that the hearing officer's refusal to call suggested witnesses did not violate plaintiff's constitutional rights because defendants met their burden of proving that the reason was justified. *Id.* at 58. Although the lower court in *Russell* did not probe defendants' stated basis for refusing to call the additional witnesses, the Second Circuit conducted its own review of the hearing and found that the witnesses' testimony would indeed have been cumulative or nonprobative.[18]

16. The reasons given by Scott for wanting the witnesses to testify only applied to two of the three witnesses requested. Scott also requested that Tanner call a third witness, Sergeant Dunlavey, towards the end of the hearing, after Albury had testified that Dunlavey "took over" for Albury in escorting Scott into the Beekman Court. Scott indicated that he wanted Dunlavey to testify as to what happened after Albury left. Scott now alleges that Dunlavey was not, in fact, present at any point during the incident and that his reason for wanting him to appear was really to impeach Albury's credibility. The Court finds that Scott's real reason for wanting Dunlavey to testify is irrelevant. What is important is that Albury testified that Dunlavey was present and Scott requested that Dunlavey be called to discuss the events that took place after Albury left. Since Tanner did not know at the time of the hearing that Dunlavey was not actually present, Tanner had no basis for finding that Dunlavey's testimony would be irrelevant.

17. In addition, the hearing officer in *Kelly*, after noting the inmate's refusal to testify, stated that he was denying the request for witnesses because, "there is no point in my calling [the] witnesses if I do not have questions to ask them [o]n [plaintiff's] behalf." *Kelly*, 962 F.2d at 146. Scott, however, was an active participant in his hearing and provided Tanner with questions to ask both of the witnesses who testified. There is no reason to believe that he would not have continued to cooperate with Tanner had Tanner called the additional witnesses requested.

18. In *Russell*, defendants explained in a Rule 3(g) statement that the hearing officer did not call the requested witnesses because their testimony would be cumulative and had no probative value. Plaintiff failed to contest defen-

In reaching this determination, the court noted that the hearing officer had already heard testimony from two alibi witnesses who stated that Russell was not a participant in the assault that he was charged with committing and was not even present when the incident took place. *Id.* at 58–59. When asked what the additional witnesses would say if they were called, Russell told the hearing officer that they would provide the same testimony as the first two witnesses. *Id.* Based on these facts, the Second Circuit concluded that the additional testimony was unnecessary.

Unlike plaintiff in *Russell,* Scott specifically told Tanner that the witnesses were present during the incident and, therefore, could testify as to what took place. Moreover, Tanner had no basis for finding, as the hearing officer did in *Russell,* that the testimony these witnesses would provide would be similar to that already heard. Since the facts in *Russell* are distinguishable from those here, *Russell* does not require this Court to revisit its original ruling. Once again, defendants' motion for summary judgment on claims four and five is denied.

**V. Sixth Cause of Action**

 Plaintiff's sixth cause of action alleges that defendants instituted disciplinary proceedings against him in retaliation for asserting his due process and equal protection rights. To make out a claim of retaliation, it is not only necessary that plaintiff prove retaliatory motive but he must also demonstrate that he was engaged in conduct that was constitutionally protected. *Blue v. Koren,* 72 F.3d 1075, 1082 (2d Cir.1995).

Scott argues, for what appears to be the first time, that the constitutionally protect-

ed conduct which he was engaged in, and which defendants retaliated against him for, was his assertion of his Sixth Amendment right to a public trial. Specifically, Scott alleges that he refused to enter the Beekman Court because the Court was located at the prison facility and therefore was not open to the public. As a result of his refusal, Scott contends, defendants instituted disciplinary proceedings against him.

The record does not support Scott's assertions. Throughout the Beekman Court incident, his disciplinary hearing, and even his pleadings in this case, Scott has alleged that he refused to enter the Beekman Court because the prison guards did not have a court order requiring his production. As stated earlier, this Court has already found that an inmate does not have a right to refuse to enter a courtroom simply because he has not been provided with a written court order requiring him to do so. *Scott v. Coughlin,* No. 90 Civ. 494 (RJW), 1990 WL 108383 *3–*4 (S.D.N.Y. July 26, 1990). Therefore, the purported right to a court order cannot form the basis for a valid retaliation claim.

Even if plaintiff's right to a public trial was in fact the reason for his refusal to enter the Beekman Court, the Court finds no evidence that Scott ever objected to the Beekman Court proceedings on this ground. If the court officers were unaware that plaintiff was refusing to enter the courtroom because the proceedings were not open to the public, then they could not have retaliated against him for asserting his Sixth Amendment rights.[19] Finding no genuine issue of material fact, the Court grants defendants' motion for summary judgment as to plaintiff's sixth cause of action.

dants' explanation. Finding no genuine issue of fact for trial, the district court granted defendants' motion for summary judgment. 35 F.3d at 58.

**19.** Even assuming that plaintiff had explained that his right to public trial was the reason for his refusal to enter the courtroom, his claim

must nevertheless fail because Scott has not alleged that retaliation against the exercise of his right to a public trial was a "substantial" or "motivating" factor in the defendants' actions, as required to maintain a successful claim of retaliation. *Blue,* 72 F.3d at 1082.

## VI. Seventh Cause of Action

### A. Malicious Prosecution

In plaintiff's opposition papers, he argues that his seventh cause of action raises a claim for malicious prosecution based on his criminal prosecution for possession of a weapon.[20] This Court effectively dismissed Scott's malicious prosecution claim in its 1991 decision granting in part and denying in part defendants' first motion for summary judgment. *See Scott v. Coughlin,* No. 90 Civ. 494, Memorandum Decision, Hon. Robert J. Ward, dated March 19, 1991 at 11 n. 6. In that decision, the Court held that a plaintiff may only prevail on a claim for malicious prosecution when the criminal proceeding was terminated in favor of the accused. Because plaintiff's case resulted in a mistrial and the charges were subsequently dismissed, the Court concluded that the proceeding was not terminated in Scott's favor.

Scott now asks the Court to reconsider its prior ruling. As discussed earlier, the Court may in its discretion, reconsider prior rulings, especially where there has been an intervening change in law or where there is a need to correct a clear error. *DiLaura v. Power Auth. of N.Y.,* 982 F.2d 73, 76 (2d Cir.1992). While Scott has not specifically invoked the "law of the case" doctrine, he has argued that the Court should revisit its malicious prosecution decision in light of a recent Second Circuit case, *Murphy v. Lynn,* 118 F.3d 938 (2d Cir.1997), *cert. denied,* 522 U.S. 1115, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998).

In *Murphy,* the Second Circuit addressed the question of when, under New York law, a prosecution which does not end in an acquittal, is nevertheless deemed to have been terminated in favor of the accused. The dispositive inquiry, the court found, is "whether the failure to proceed implies a lack of reasonable grounds for the prosecution." *Id.* at 948 (citations omitted). The answer, the Court indicated, will depend on the reason for the abandonment.

Based on *Murphy,* Scott argues that the Court erred in finding that the termination of the criminal proceedings against him was not in his favor as required to bring an action for malicious prosecution. He notes that the termination of the prosecution was not the result of a compromise reached between himself and the state. Rather, the state unilaterally moved to dismiss the charges against him. As such, he contends, the Court should find that the prosecution was, in fact, terminated in his favor.

██ The Court agrees that the claim of malicious prosecution should be reinstated since the Court did not examine the underlying reason for the abandonment of the prosecution as required by *Murphy.*[21] However, the Court is not prepared to find that the termination of the criminal pro-

---

**20.** Scott also alleges in his seventh cause of action that Novak and Howe violated his due process rights by falsely charging and prosecuting him for possession of a weapon. As discussed above, Novak and Howe are both entitled to qualified immunity because neither violated Scott's clearly established constitutional or statutory rights. See Supra at 313–15. To the extent Scott argues that Novak and Howe are liable for the alleged due process violations that occurred at his subsequent disciplinary hearings, Novak and Howe were not sufficiently personally involved in those violations to be held liable. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986).

**21.** Contrary to defendants' contention, plaintiff's claim for malicious prosecution is not time-barred. For claims based on malicious prosecution, the statute of limitations only begins to run when the underlying criminal action is conclusively terminated. *Murphy v. Lynn,* 53 F.3d 547, 548 (1995). The criminal charges brought against plaintiff which form the basis of his malicious prosecution claim were dismissed on January 19, 1989. *See* Affidavit of Michael W. Martin in Support of Plaintiff's Motion to Amend the Complaint and for Partial Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment and to Amend the Answer, dated Aug. 25, 1995, Ex. 8. Plaintiff filed his complaint on January 22, 1990, well within the three year limitations period.

ceedings against Scott was necessarily in his favor. Generally, whether a termination was favorable is a question of law for the court to decide. *Id.* However, where as here, the court does not know the circumstances underlying the termination, that question is one for the trier of fact. *Id.* at 950. Therefore, the Court reinstates this claim but does not find that the proceedings were terminated in plaintiff's favor.

## CONCLUSION

Based on the foregoing, defendants' second motion for summary judgment is granted in part and denied in part. Defendants' motion is granted as to those claims brought against Coughlin, Scully, Winch, and Seitz because these defendants lacked sufficient personal involvement to be held liable for any alleged constitutional violations. The motion is also granted with respect to Albury, LaBonte, Novak, and Howe based on qualified immunity. Furthermore, defendants' motion for summary judgment is granted as to plaintiff's third and sixth causes of action because plaintiff has failed to show that any genuine issues of material fact exist and the Court finds no violation of Scott's constitutional rights with respect to these claims.

However, defendants' motion is denied with respect to the *Sandin* issue, Tanner's claim of qualified immunity, and Plaintiff's fourth and fifth causes of action alleging that Tanner's denial of plaintiff's request to call witnesses violated Scott's right to due process. Finally, the Court reinstate's plaintiff's seventh cause of action for malicious prosecution. The parties are directed to file a pre-trial order on or before March 1, 2000.

It is so ordered.